[958 NE2d 93, 934 NYS2d 59]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ANGEL ROSARIO, Respondent.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUIS PARADA, Appellant.

Argued September 7, 2011; decided October 18, 2011

**POINTS OF COUNSEL**

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Matthew C. Williams* and *Richard Nahas* of counsel), for appellant in the first above-entitled action. Evidence of the victim's disclosure to her boyfriend of defendant's sexual abuse was properly admitted both as a prompt outcry and to rebut the defense claim that she fabricated the allegations of sexual abuse on the day she reported them to the police. (*People v O'Sullivan*, 104 NY 481; *Baccio v People*, 41 NY 265; *People v McDaniel*, 81 NY2d 10; *People v Rice*, 75 NY2d 929; *People v Shelton*, 1 NY3d 614; *People v Aguirre*, 262 AD2d 175; *People v Bonilla*, 200 AD2d 369; *Matter of Gregory AA.*, 20 AD3d 726; *People v Vanterpool*, 214 AD2d 429; *People v James*, 247 AD2d 251, 93 NY2d 620.)

*Law Offices of London & Robin*, New York City (*Meredith S. Heller* and *Ira D. London* of counsel), for respondent in the first

above-entitled action. I. The Appellate Division properly held that the trial court had erred in admitting testimony as "prompt outcry" when the statement was not made at the first suitable opportunity and there was no reasonable explanation for the months-long delay. (*People v Van Ness*, 43 AD3d 553; *People v McClean*, 69 NY2d 426; *People v McDaniel*, 81 NY2d 10; *People v Rice*, 75 NY2d 929; *People v O'Sullivan*, 104 NY 481; *People v Banks*, 27 AD3d 953; *People v Allen*, 13 AD3d 892; *Matter of Gregory AA.*, 20 AD3d 726; *People v Vanterpool*, 214 AD2d 429.) II. The Appellate Division properly held that the trial court erred in admitting testimony under the "recent fabrication" exception to the hearsay rule when the prior statements did not predate the declarant's motive to lie and defense counsel did not open the door to their admission. (*People v McClean*, 69 NY2d 426; *People v Davis*, 44 NY2d 269; *People v McDaniel*, 81 NY2d 10; *People v Seit*, 86 NY2d 92; *People v Melendez*, 55 NY2d 445; *People v Rojas*, 97 NY2d 32; *People v Massie*, 2 NY3d 179; *People v Mann*, 31 NY2d 253; *People v Lago*, 60 AD3d 784; *People v Jones*, 258 AD2d 383.)

*Glenn A. Garber, P.C.*, New York City (*Glenn A. Garber* and *Angharad Vaughan* of counsel), for appellant in the second above-entitled action. I. The complainant's statements at the child advocacy center detailing the alleged sexual abuse, during an exam conducted at the behest of law enforcement the day before the complainant and the examining nurse testified before the grand jury, more than two years after the alleged abuse, were not sufficiently related to medical diagnosis and treatment to be admissible hearsay, and should have been excluded. (*People v Rogers*, 8 AD3d 888; *People v Bailey*, 252 AD2d 815; *People v Ballerstein*, 52 AD3d 1192; *Williams v Alexander*, 309 NY 283; *People v Kennedy*, 68 NY2d 569; *People v Cratsley*, 86 NY2d 81; *Johnson v Lutz*, 253 NY 124; *Matter of Leon RR*, 48 NY2d 117; *People v Bradley*, 15 AD3d 840; *People v Jackson*, 124 AD2d 975.) II. It was harmful error for the state's expert to testify that behaviors including tantrums and rebelliousness are indicative of child sexual abuse, and for the prosecutor to argue that the complainant's manifestation of these behaviors proved that the allegations of abuse were true. (*People v Shay*, 210 AD2d 735; *De Long v County of Erie*, 60 NY2d 296; *Dougherty v Milliken*, 163 NY 527; *People v Carroll*, 95 NY2d 375; *Chambers v Mississippi*, 410 US 284; *People v Hudy*, 73 NY2d 40; *People v Taylor*, 75 NY2d 277; *People v Keindl*, 68 NY2d 410; *People v Banks*, 75 NY2d 277; *People v Stuckey*, 50 AD3d 447.) III. The complainant's statements to her aunt detailing the alleged

abuse, two years after the period of alleged abuse ended, were not admissible as "prompt outcry," and it was harmful error to permit the complainant and the aunt to improperly bolster the complainant's credibility with testimony about these prior statements. (*Crawford v Nilan*, 289 NY 444; *People v Seit*, 86 NY2d 92; *People v McClean*, 69 NY2d 426; *People v McDaniel*, 81 NY2d 10; *People v Rice*, 75 NY2d 929; *People v Deitsch*, 237 NY 300; *People v O'Sullivan*, 104 NY 481; *People v Leon*, 209 AD2d 342; *People v Crimmins*, 36 NY2d 230; *People v Baker*, 23 NY2d 307.) IV. The trial court erred by permitting the complainant's uncorroborated testimony that she reported the alleged abuse to her eight-year-old cousin who promised to keep it a secret, as such report was not a "prompt outcry," and constituted improper bolstering of the complainant's credibility. (*People v McDaniel*, 81 NY2d 10; *People v O'Sullivan*, 104 NY 481.) V. It was an abuse of discretion and harmful error to permit a detective on redirect to relate the entire statement by the complainant graphically describing the alleged sexual abuse, in response to defense counsel's impeachment on a specific, narrow point in the complainant's statement to police, where no limiting instruction was given and the prosecutor utilized this testimony as substantive evidence. (*People v Massie*, 2 NY3d 179.) VI. The cumulative impact of numerous evidentiary errors and improper argument by the prosecutor rendered the trial fundamentally unfair and deprived defendant-appellant of a fair trial and due process of law, where the only evidence of guilt was the uncorroborated testimony of the 11-year-old complainant and all of the errors had the direct effect of bolstering the complainant's credibility. (*People v Crimmins*, 36 NY2d 230; *People v Calabria*, 94 NY2d 519; *People v Dowdell*, 88 AD2d 239; *People v Ortiz*, 116 AD2d 531; *People v Nevedo*, 202 AD2d 183; *People v McDaniel*, 81 NY2d 10; *People v McClean*, 69 NY2d 426; *People v Allweiss*, 48 NY2d 40; *People v Rice*, 75 NY2d 929.)

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Sheila O'Shea* and *Eleanor J. Ostrow* of counsel), for respondent in the second above-entitled action. I. Defendant's challenges to the admission of the complainant's prior statements are partially waived and partially unpreserved; in any event, those statements were properly admitted. (*People v McDaniel*, 81 NY2d 10; *People v Williams*, 75 NY2d 858; *People v Stuckey*, 50 AD3d 447; *People v Aguirre*, 262 AD2d 175; *People v Vasquez*, 221 AD2d 575; *People v Vanterpool*, 214 AD2d 429; *People v Clarke*, 81 NY2d 777; *People v Kelly*, 5 NY3d 116; *People v Melendez*, 55 NY2d 445; *People v Rojas*, 97 NY2d 32.) II. Contrary to

defendant's unpreserved claims, Dr. Treacy's expert testimony and the prosecutor's summation remarks concerning that testimony were entirely appropriate. Moreover, even if the People's use of that testimony was improper in any respect, the error was harmless. (*People v Clarke*, 81 NY2d 777; *People v Taylor*, 75 NY2d 277; *De Long v County of Erie*, 60 NY2d 296; *People v Abney*, 13 NY3d 251; *People v Lee*, 96 NY2d 157; *People v Carroll*, 95 NY2d 375; *People v Cintron*, 75 NY2d 249; *People v Keindl*, 68 NY2d 410; *People v Gregory,* 78 AD3d 1246; *People v Torres*, 78 AD3d 866.)

## OPINION OF THE COURT

READ, J.

The issue for us to decide in these two cases is whether prior consistent statements alleging sexual abuse were properly admitted under the prompt outcry rule or, alternatively in the *Rosario* case, to rebut a claim of recent fabrication. In both appeals, we affirm the Appellate Division, which concluded that the prior consistent statement was inadmissible in *Rosario*, and admissible in *Parada*.

## I.

*Rosario*

Complainant, who was 16 at the time of trial, testified that her father, defendant Angel Rosario, began to abuse her sexually when she was about nine years old. Over the next four or five years, he would frequently rub his body against hers when he encountered her alone in the family's apartment, pressing his penis against her. He would make complainant perform oral sex on him, and once put his mouth on her vagina when she was in her bedroom, watching the Disney Channel on television. When complainant was 13 years old, defendant penetrated her vagina with his penis. Then in early 2004, when complainant was 14 years old and in ninth grade, she struggled with and resisted defendant when he forced sexual intercourse on her. Complainant says that she told defendant "This is never going to happen again," and that he did not touch her sexually after this encounter. At no time did defendant ejaculate, and, in every instance, the penetration was slight. Complainant did not tell

anyone in her extended family[1] about defendant's sexual advances because she was scared that she would not be believed and would get into trouble, and she was fearful about how her mother would react.

By January 2004, about the time the abuse stopped, complainant had started dating. In May 2004, her boyfriend noticed that she was upset and asked her what was wrong. They were in the school courtyard at the time. Because she "had difficulty saying" what was bothering her, complainant's boyfriend suggested that she write it down. Complainant then took a piece of paper from her book bag and wrote the following note, which she handed to her boyfriend for him to read:

> "Well, um I kind of get sexually harassed by my Dad since I was I think 10. And im not very proud of it + I havent told nebody cause he's my dad n i didn't want him 2 go away + pwease don't tell ne1 [and] lately ive bin pushing him off n stuff so like yeah. please don't say anything."

When complainant's boyfriend responded by "look[ing] at [her] like, are you serious? Can this really happen and why didn't you tell anybody" she felt "embarrassed and ashamed." Complainant's boyfriend testified that he slipped the note into his pocket, unbeknownst to complainant; she testified that he crumpled up the note and threw it away as they left the courtyard. Complainant was not sure when she wrote the note, but thought it "must have been May" or perhaps "earlier"; her boyfriend asserted that this episode took place in May 2004. He located the thought-to-be-lost note (which was admitted into evidence) in February 2006, and produced it for the District Attorney two days before he testified on June 8, 2006.

On June 24, 2005, about a year after she wrote the note, complainant argued with defendant when he refused to let her go to the movies with her boyfriend. Having gotten friendly with Police Officers Anthony Flores and Slade Bradley, who ran the Explorers Program sponsored by the New York Police Department,[2] complainant stopped by the stationhouse to talk to Officer Flores. When he was not there, she went to the movies with her boyfriend, in defiance of defendant. But once at the

---

1. Complainant testified that she saw her maternal grandparents, who lived across the street, daily; she was also close to her paternal uncle, who lived in Puerto Rico and whom she saw on holidays.

2. This is a program designed to educate teenagers about law enforcement.

movies, she got nervous about getting into "severe trouble" and being "hit" by defendant, a stern disciplinarian who inflicted corporal punishment when displeased with her behavior.

Before returning home, complainant called Officer Flores (whom defendant had also contacted, fearing that his daughter had run away from home after their argument). Officer Flores picked complainant up at the movies and returned with her to the stationhouse. Once there, complainant spoke with both Officers Flores and Bradley (a woman), telling them that defendant had sexually abused her. According to complainant, she decided to report "what was going on" at that point in time because she was tired of "all of the stuff that went on in [her] house" and did not want to be molested anymore. The officers took complainant to meet with a detective in the Manhattan Special Victims Squad, to whom she repeated her claim of sexual abuse. Defendant was arrested and subsequently indicted for first-degree course of sexual conduct against a child (Penal Law § 130.75 [1] [b] [being at least 18 years old and engaging in two or more acts of sexual conduct over a period of time not less than three months in duration with a child less than 13 years old]), first-degree rape (Penal Law § 130.35 [1] [engaging in sexual intercourse by forcible compulsion]) and other lesser charges.

At trial, defendant denied his daughter's accusations; his wife testified that she had never noticed any change in her daughter's personality or behavior toward defendant. In summation, the defense argued that complainant—portrayed as a willful only child, angry at defendant for restricting her freedom and anxious about the punishment he would mete out for her disobedience on June 24, 2005—embroidered a tale of mistreatment by her father with a claim of sexual abuse (perhaps in response to a suggestive question posed by Officer Bradley) and then found herself "backed into a corner." The jury convicted defendant of all the charges submitted to it, including first-degree course of sexual conduct against a child, and first- and second-degree rape. The trial judge sentenced defendant to an aggregate term of 15 years in prison, to be followed by five years of postrelease supervision.

The Appellate Division reversed the judgment, holding that the note did not qualify as a prompt outcry "in view of the months-long delay between the charged conduct and the writing of the note, especially in the absence of a sufficient explanation for the complainant's not confiding in someone else earlier" (68

AD3d 600, 601 [1st Dept 2009]). The court further concluded that the note was not admissible as a proper rehabilitative response to a defense claim of recent fabrication for two reasons: "It was offered on the People's direct case . . . in the course of the complainant's direct testimony, *in anticipation of* a defense of recent fabrication"; and at the time

> "the note was admitted into evidence, the defense had done nothing to specify to the jury . . . when and how the complainant had decided to make a false accusation against defendant [and] could as easily have claimed that the complainant's motivation . . . arose years earlier, in response to defendant's controlling and overbearing conduct over the years, rather than on June 24, 2005" (*id.* at 602 [emphasis added]).

A Judge of this Court granted the People permission to appeal (15 NY3d 809 [2010]).

*Parada*

Complainant testified that defendant Luis Parada sexually abused her when he babysat her after school and during school breaks from mid-2002 until early 2004 at the apartment where she resided with her mother and four brothers and the man with whom her mother then had a relationship, a childhood friend of defendant. Specifically, complainant, who was six or seven when the alleged abuse took place and 11 at the time of trial, testified that defendant twice anally sodomized her, causing rectal bleeding that she once reported to her mother (although not its cause), and also touched and penetrated her vagina with his finger, forced her to touch his penis and would lie on top of her on occasions when he was alone with her, or only her infant brother was also present in the apartment. According to complainant, defendant would tell her not to tell anyone because it was their "secret" or "something bad w[ould] happen." While defendant was still babysitting her, though, complainant disclosed to a female cousin, who was one year older, that defendant had "put his front private part in[to her butt]." Complainant made her cousin "pinky promise" not to tell anyone because she "thought they wouldn't believe [her]."

Defendant's babysitting duties ended sometime after complainant's mother and his friend broke up in early 2004, and complainant's mother moved in with her brother and sister-in-law, whose children included the cousin in whom complainant

had earlier confided. According to complainant's mother, in early 2005, defendant telephoned her, saying that "he wanted to know how the kids were doing and . . . to come over and see [them]." She invited defendant to her brother's apartment, and he offered to take complainant and her younger brother to the Museum of Natural History. Complainant, described by her mother as "more stunned than happy" to see defendant, asked her cousin to go along on this trip because she "did not want to go alone with [defendant]." After the museum visit, complainant let her mother know that she did not want to see defendant again.

In mid-May 2006, complainant revealed to her paternal aunt that defendant had "touched her" when he babysat her. At complainant's insistence, her aunt agreed to keep this a secret. On another occasion, complainant again talked to her aunt about "what [had] happened to her." Then in late June 2006, while mother and daughter were in the kitchen washing and drying the dishes after dinner, complainant's mother initiated a conversation with her about boys, telling complainant "not [to] let[ ] anyone touch her" or "put their hands on [her] body." She assured complainant that "if anyone ever[ ] put[ ] their hands on" her, she should tell her mother, who would protect her. At that point, complainant blurted out that "someone" had already touched her. After her mother mentioned the names of two adult males, complainant "broke down and started crying" and "said it was [defendant]." Complainant's mother contacted the police the next day, and defendant was arrested and eventually indicted for first-degree course of sexual conduct against a child (Penal Law § 130.75 [1] [a] [engaging in two or more acts of sexual conduct over a period of time not less than three months in duration with a child less than 11 years old]).

Prior to defendant's jury trial, the People moved to introduce into evidence complainant's statements to her cousin and aunt about defendant's sexual abuse. Defendant objected that these disclosures did not constitute prompt outcry. The trial judge decided that the testimony could come in, however, and complainant and her aunt testified as described. Defendant took the stand and professed innocence. His expert, a psychiatrist with experience in evaluating child victims of sexual abuse, testified that children may allege molestation to get even with someone in their environment, and sometimes "confabulate" or "introduce fantasy" into their statements. The jury convicted defendant of the charged offense, and Supreme Court

subsequently sentenced him to 20 years in prison followed by five years of postrelease supervision.

The Appellate Division, with two Justices dissenting, affirmed the judgment, ruling that the trial judge properly admitted complainant's revelation to her cousin as a prompt outcry because "it was made during the period wherein [complainant] was being sexually abused" (67 AD3d 581, 582 [1st Dept 2009]). The court further concluded that while Supreme Court errone-ously admitted complainant's disclosures to her aunt, the error was harmless. Finally, the court declined to reach, in the inter-est of justice, defendant's unpreserved challenges to the admis-sion of certain prior consistent statements that complainant made to a pediatric nurse who examined her and a detective who interviewed her, and portions of the People's summation and, alternatively, rejected these challenges on the merits or considered any error to be harmless. Further, "[t]o the extent the existing record permit[ted]," the court concluded that de-fendant received effective assistance of counsel (id. at 583).

The dissenting Justices would have exercised discretion in the interest of justice to decide defendant's unpreserved arguments, which they considered meritorious. In their view, the "cumula-tive effect" of the various unpreserved and preserved "eviden-tiary errors on a conviction that rest[ed] essentially on the cred-ibility of an 11-year-old child" was not harmless (id. at 586). A dissenting Justice granted defendant permission to appeal to us.

## II.

As a general rule, "evidence that a victim of sexual assault promptly complained about the incident is admissible to corrob-orate the allegation that an assault took place" (People v Mc-Daniel, 81 NY2d 10, 16 [1993]). The prompt outcry rule—an exception to the inadmissibility of the prior consistent state-ments of an unimpeached witness—"permits evidence that a timely complaint was made," but does not allow further testimony as to the "details of the incident" (People v Rice, 75 NY2d 929, 932 [1990]).[3] In a classic exposition of the original reasoning underlying the prompt outcry rule, the Court stated that

"[i]t is a general rule that the evidence of a witness
can never be corroborated or confirmed by proof

---

**3.** When the note was admitted into evidence in *Rosario*, defense counsel did not object that its contents were inadmissible. In any event, the note contained few details, and no descriptions of any specific alleged act of "sexual harrass[ment]."

that the witness stated the same facts testified to in court on some occasion when not under oath. Such statements, like all hearsay evidence, are excluded as unsatisfactory and incompetent. But there is an exception to the rule in the case of rape. The outrage in such a case upon a virtuous female is so great that there is a natural presumption that at the first suitable opportunity she would make disclosure of it; and she would be so far discredited if she did not make disclosure, for the purpose of confirming her evidence where she is a witness, such disclosure may be received. But where the disclosure is not recent, as soon as suitable opportunity is furnished, the reason for receiving the evidence does not exist, and the principle justifying its reception does not apply" (*People v O'Sullivan*, 104 NY 481, 486 [1887] [disclosure made 11 months after the commission of the alleged rape was too remote to qualify as a prompt outcry]).

As we recognized in *McDaniel*, though, "[t]he contemporary rationale for permitting prompt outcry evidence is that some jurors would inevitably doubt the veracity of a victim who failed to promptly complain of a sexual assault" (*McDaniel*, 81 NY2d at 16).[4] Finally, we have made clear that "promptness is a relative

---

4. In some instances, the People may seek to counter any potential juror misconception in this regard by calling an expert to explain why a victim of sexual abuse might not promptly report the crime (*see People v Spicola*, 16 NY3d 441, 460-463 [2011] [expert testified about a range of behaviors observed in cases of validated child sexual abuse, some of which may seem counterintuitive to a lay person, including delayed reporting of abuse]). Judge Smith suggests that we should also expand our traditional prompt outcry rule, as several other states have done, in an effort to help the jury decide whether an alleged victim is telling the truth or lying, and would decide these cases by applying his new rule (*see* concurring/dissenting op at 516, 519). But defendants and the People disputed only whether the outcry was, in fact, sufficiently prompt under New York law; the People did not ask the trial court to broaden the rule. In a related vein, we note that the Supreme Judicial Court of Massachusetts resolved *Commonwealth v King* (445 Mass 217, 834 NE2d 1175 [2005]) on the basis of its traditional fresh complaint doctrine, which was similar, but not identical, to our prompt outcry rule. The Court sua sponte, in the exercise of its power to regulate evidentiary presentations not implicating constitutional rules, reexamined and prospectively revised its traditional fresh complaint doctrine only after soliciting and receiving numerous amicus briefs discussing whether modification or elimination was in order (445 Mass at 237 n 16, 248, 248 n 29, 834 NE2d at 1194 n 16, 1201, 1201 n 29).

concept dependent on the facts—what might qualify as prompt in one case might not in another" (*id.* at 17).

*Rosario*

■ Applying these principles to the facts in *Rosario*, too much time (perhaps as long as five months) elapsed between the last instance of alleged sexual abuse and the note for this evidence to qualify as a prompt outcry. Although there is no hard-and-fast rule as to the timeliness of a prompt outcry, the concept of promptness necessarily suggests an immediacy not ordinarily present when months go by, especially when the complainant is a teenager, not a child (*see e.g. id.* at 14 [daughter told her mother about a nighttime sexual assault the following morning]; *Rice*, 75 NY2d at 931 [victim reported her rape to the police after her assailant fled]; *People v Stearns*, 72 AD3d 1214 [3d Dept 2010] [victim told her former boyfriend of rape the following morning]; *People v Aller*, 33 AD3d 621 [2d Dept 2006], *lv denied* 8 NY3d 918 [2007] [victim told her mother of the sexual assault within 12 hours of the attack]).

The People also argue in *Rosario* that, even if not a prompt outcry, the note and the testimony about it were admissible to rebut a claim of recent fabrication. Generally, a witness's trial testimony may not be bolstered with prior consistent statements (*McDaniel*, 81 NY2d at 16) because "an untrustworthy statement is not made more trustworthy by repetition" (*People v McClean*, 69 NY2d 426, 428 [1987]; *see also* DuBois, *A Matter of Time: Evidence of a Victim's Prompt Complaint in New York*, 53 Brook L Rev 1087, 1092-1093 [1988] [explaining that the inadmissibility of an unimpeached witness's prior consistent statements is "based on the theory that simple 'repetition does not imply veracity' "; that such statements are "presumed to lack probative value"; that "their introduction hinders trial efficiency"; and that their use in a criminal case "may prejudice the defendant by unduly bolstering the credibility of the prosecution's witness" (internal quotation marks omitted)]). Nevertheless, "otherwise inadmissible evidence may become admissible where the adverse party has 'opened the door' to it by offering evidence, or making an argument based on the evidence, which might otherwise mislead the factfinder" (*People v Massie*, 2 NY3d 179, 180 [2004]). When a "witness'[s] testimony is assailed—either directly or inferentially—as a recent fabrication, the witness may be rehabilitated" with a prior consistent statement made at a time predating the motive to fabricate (*McDaniel*, 81 NY2d at 18; *see also People v Seit*, 86 NY2d 92, 96 [1995]; *McClean*, 69 NY2d at 428).

According to the People, defense counsel in her opening statement implicitly accused complainant of lying, thus opening the door to admission of evidence about the note in their direct case. Defense counsel in her opening statement first described defendant as a strict father, plagued by health problems, with high academic expectations of his daughter; she acknowledged that defendant smoked marijuana. She gave a factual account of the events of June 24, 2005, which were not in dispute, and complainant's parents' frantic efforts to locate her, commenting that "[e]ventually they [complainant's parents] find her. She had gone to the movies with her boyfriend and saw *Batman* that day. It's now late in the evening. So the story begins." Finally, defense counsel asked the jurors to keep an open mind; reminded them that the allegations were serious; and described defendant as a dedicated and loving family man "devastated by this situation."

■ The People single out defense counsel's use of the word "story," claiming that she suggested a recent fabrication by "discuss[ing] in detail the events of [June 24, 2005] and . . . telling the jury that the 'story' began after the police found [complainant] that day."[5] Fabrication may have been an obvious (indeed, the only) defense here, as is often the case where a claim of sexual abuse is contested. But we cannot say that any remarks made by defense counsel in her opening statement created a misleading impression that opened the door for the People to elicit evidence of the note in their direct case (*see Massie*, 2 NY3d at 184 ["(A) trial court should decide 'door-opening' issues in its discretion, by considering whether, and to what extent, the evidence or argument said to open the door is incomplete and misleading, and what if any otherwise inadmissible evidence is reasonably necessary to correct the misleading impression"]).[6]

---

**5.** As a matter of fact, defense counsel did not mention the police in her opening statement at all. The closest she came was mentioning that the Rosarios called "the Explorer's Program" (after calling complainant's grandmother and friends and "friends involved in the afterschool program") when trying to locate their daughter on June 24, 2005.

**6.** Judge Smith suggests that the jurors could not have been "so dull-witted" as to "miss the point" that defense counsel was trying to make a connection between the father-daughter argument on June 24, 2005 and complainant's accusation (concurring/dissenting op at 521). But defense counsel did not relate complainant's accusation to this particular father-daughter dispute as opposed to defendant's strictness and demands of complainant in general (or, for that matter, his use of corporal punishment

*Parada*

■ To the extent that defendant now asserts that disclosure to a child can never constitute a prompt outcry, he did not raise such a claim at trial; he argued only that complainant's statement to her cousin was not sufficiently prompt. In any event, we see no reason to disallow prompt outcry testimony where a child victim discloses sexual abuse to a peer (*see People v Aguirre*, 262 AD2d 175 [1st Dept 1999] [child disclosed to her best friend]). And complainant told her cousin of the abuse a few weeks after defendant anally sodomized her.[7] Importantly, as the Appellate Division noted, complainant made this disclosure before the sexual abuse ended.

■ Finally, the admission of complainant's disclosures to her aunt was harmless error. True, this case rested on the testimony of an 11-year-old witness who was recounting events that had occurred several years in the past. But complainant described the events in age-appropriate terms and provided details that she could not have gleaned from watching television or movies, as defense counsel suggested. She had no motive to implicate defendant. And while he repeatedly describes complainant's testimony as "vague and inconsistent," defendant never points out any specific inconsistencies. His vagueness claims boil down to complainant's uncertainty about the dates when these acts occurred—hardly surprising given that the abuse occurred over the course of two years and involved a child.

Defendant's remaining arguments, to the extent preserved, are without merit.

Accordingly, the orders of the Appellate Division in *People v Parada* and *People v Rosario* should be affirmed.

SMITH, J. (dissenting in *People v Rosario* and concurring in *People v Parada*). In each of these cases, defendant was convicted of sexually abusing a young girl. In each case, a long time passed before the abuse was reported to the authorities. Evidence was admitted in each case showing that, during that time, the victim confided the secret to someone: the victim in *Rosario* told her boyfriend, and the victim in *Parada* told her

---

when she did not meet his expectations). In short, it was not obvious from defense counsel's opening statement that the note predated complainant's alleged motive to lie.

7. When the prosecutor asked complainant at trial when she made the disclosure to her cousin, she answered "That was like a few weeks ago when he did this to me," apparently meaning that defendant had anally sodomized her a few weeks before the disclosure.

aunt. The majority holds that it was error to admit the evidence of these disclosures.

I disagree. I admit that neither disclosure qualifies as a "prompt outcry," according to the nineteenth century rule that our cases have followed to date. But I believe that the limits of that rule have become obsolete. The critical question in these cases is whether the victims were telling the truth or lying—and it is simply unfair, to the People and to the victims, to conceal from the jury powerful evidence that shows they were telling the truth. I would therefore adopt a broader version of the prompt outcry rule, permitting the jury to know of any disclosure made by the victim about the crime before the crime was reported to the authorities.

Applying that rule, I would reverse the order of the Appellate Division in *People v Rosario* and reinstate the conviction; in *People v Parada*, I would hold that there was no error in admitting the evidence, thus making it unnecessary to reach the question of harmless error. In *Rosario*, I also vote to reverse for another reason: I believe the evidence was properly admitted under the recent fabrication exception to the hearsay rule.

## I

The People, as well as those accused of crimes, are entitled to a fair trial. I think it important to understand just how unfair the trials in these two cases would have been without the evidence that the majority holds should not have been admitted.

In *Rosario*, the unfairness is particularly stark. Without the evidence that is in dispute, the jury would have known only that the victim reported her father's abuse to the police on the same day that she had a fight with him because he forbade her to go to the movies with her boyfriend. Any fairminded juror considering these facts would have to recognize the possibility that the accusation was invented in anger—and thus might well have a reasonable doubt that the accusation was true.

But a juror who voted to acquit for that reason would have been grossly misled. The victim made the same accusation, reluctantly and in confidence, in a note to her boyfriend, a year earlier, at a time when she was actually trying to protect her father "cause he's my dad n i didn't want him 2 go away." I find the note very convincing evidence that the victim was telling the truth—and conclusive evidence that she did not invent the abuse after an argument with her father a year later. There is no common sense reason for keeping this evidence from the jury.

The injustice in *Parada* is less extreme because—as the majority's harmless error finding reflects—the case against Parada was strong even without the disputed evidence. But I do not find it as hard as the majority does to imagine an acquittal if the evidence had been kept out. If that had happened, no witness except the victim's mother would have testified to having heard the victim disclose the abuse before the authorities were involved. The victim testified to the "pinky promise" disclosure to her cousin, but the cousin was not called as a witness. There was no forensic evidence of abuse. Defendant testified, in what seems from the transcript a straightforward and convincing way, that he had never done and never would do any of the things the victim accused him of. It seems possible to me that a juror could have thought his denial raised a reasonable doubt; that the victim and her mother might for some reason (perhaps to protect the true abuser) have concocted a false story.

But a juror who heard the testimony of the victim's aunt would have been much less likely to harbor such a doubt. The aunt—a woman in her early 20s, with whom the victim had lived off and on—testified that she frequently observed the victim crying for no apparent reason. When the victim was 11, a month before any report to the authorities, this led to the following conversation, as the aunt recounted it:

> "I took [the victim] in to the living room with me, I sat down with her and I asked her what was going on, why was she crying like that, she should have no reason to be crying so much.
>
> "At that point she told me that she had said to me before remember I had something to tell you and I didn't say anything to you. I told her yes I do remember, and she told me that the problem was that Buddy was touching me . . . .
>
> "Q. When she told you that Buddy had touched her when she lived at the apartment, describe her demeanor when she told you that, her tone of voice?
>
> "A. She said it low, at the same time she was trying to still catch her breath from crying and she was just crying and she was with her head down like she wanted to took a look at me and tell me to my face.
>
> "Q. Was she still hugging you?
>
> "A. Yes, she was still hugging me.
>
> "Q. Were you hugging her?

"A. Yes.

"Q. Had you ever seen her like this before?

"A. No, not like that . . . .

"Q. Did she ask you to keep this a secret?

"A. Yes."

Short of imagining a conspiracy of which the aunt was a member, it is hard for me to see how a jury that heard that testimony would think the victim a liar. And again, there is no common sense reason why the jury should not have heard it.

## II

In general, the hearsay rule prohibits the admission into evidence of out-of-court statements to prove the truth of the matter stated. This rule applies even to prior statements of a testifying witness that are consistent with the witness's testimony. As the majority explains (majority op at 513), the reason generally given for the exclusion of prior consistent statements is that "an untrustworthy statement is not made more trustworthy by repetition" (*People v McClean*, 69 NY2d 426, 428 [1987]). While this is undoubtedly true, it is also true that jurors are smart enough to know it, and thus in most cases so-called "bolstering" testimony does little harm. Indeed, the most cogent objection to it seems to be that it is generally a waste of time—that it "hinders trial efficiency," as a law review article quoted by the majority suggests (majority op at 513).

Since the admission of prior consistent statements is rarely prejudicial, courts should be, and often are, willing to relax the rule excluding such statements when their admission will advance the efforts of a factfinder to learn the truth. The prompt outcry rule unquestionably advances those efforts. It was originally justified by the realization that jurors were likely to be suspicious of a rape victim who did not make outcry promptly. The majority quotes (majority op at 512) our explanation for the rule a century and a quarter ago:

> "The outrage in such a case upon a virtuous female is so great that there is a natural presumption that at the first suitable opportunity she would make disclosure of it; and she would be so far discredited if she did not make the disclosure, for the purpose of confirming her evidence where she is a witness, such disclosure may be received" (*People v O'Sullivan*, 104 NY 481, 486 [1887]).

Obviously, our understanding of the "natural" reaction of a rape victim has changed since 1887. It is now well-known that, in many cases, it is difficult for the victim to report the crime or to accuse her attacker. And delayed reporting, often understandable in the case of adult victims, is even more so in the case of children abused by adults. No one, surely, would endorse today our statement in *O'Sullivan* that "[a] disclosure in a case of rape has no legal value whatever unless it is the natural result of the horror and sense of wrong which would prompt every virtuous female to make outcry at the first suitable opportunity" (*id.* at 490). This change in our understanding, however, is not a reason to abandon the prompt outcry exception to the hearsay rule (*see People v McDaniel*, 81 NY2d 10, 16-17 [1993]). It is a reason to expand it.

Remote as we are from nineteenth century visions of the natural reaction of an "outraged female," the question "why didn't she complain sooner?" is still asked, and will and should continue to be asked, in trials for rape and other forms of sexual abuse. The question is asked not because there can be no good answer to it, but because anyone interested in the truth will want to know what the answer is. When part of the answer is that the victim *did* complain sooner, to a friend or relative in confidence, the jury should know it. To avoid discussion of the question—to pretend that a delay in reporting sexual abuse is totally irrelevant—would be both unfair and self-defeating, because the question will be in jurors' minds even if lawyers and witnesses do not talk about it.

Recognizing the importance of disclosure evidence in sexual abuse cases, a number of state courts have expanded the traditional prompt outcry rule. Massachusetts has discarded the "requirement of 'promptness' or 'freshness,' " finding that it "no longer withstands scrutiny as a cure to the problem of juror stereotyping in cases of sexual assault" (*Commonwealth v King*, 445 Mass 217, 242, 834 NE2d 1175, 1197 [2005]). California has revised its law to hold that proof of an extrajudicial complaint may be admissible "whether it was made promptly after the incident or . . . at a later date" (*People v Brown*, 8 Cal 4th 746, 750, 883 P2d 949, 951 [1994]). And Connecticut, discarding dictum in an earlier case, has rejected the rule that a complaint must have "been made at a 'natural' time" (*State v Parris*, 219 Conn 283, 284, 292, 592 A2d 943, 944, 948 [1991]).

I propose that we join those states in recognizing that contemporary understanding of the complexities of reporting

sex crimes calls for a broader exception to the hearsay rule. The rule I would adopt is a simple one: When a victim testifies to an act of rape or sexual abuse, every disclosure of the alleged crime by the victim before it was reported to the authorities should be admissible, subject of course to a trial court's normal power to exclude evidence that is repetitive, unnecessarily inflammatory or otherwise prejudicial. To me, the good that such a rule can do is obvious, and I do not see how it can do any harm.

## III

Even if our prompt outcry rule is not broadened, I would reinstate Rosario's conviction, because I believe the victim's note to her boyfriend was properly admitted under the recent fabrication exception to the hearsay rule. Under that exception, when a witness's statement is attacked, directly or by inference, as a recent fabrication, a prior consistent statement made before the alleged motive to fabricate arose is admissible to rebut the attack (*People v McClean*, 69 NY2d at 428).

Rosario's argument here, which the majority accepts, is essentially that the People had to wait for him to make the recent fabrication argument before they rebutted it. As a general rule, of course, the People cannot offer hearsay "in anticipation of" a defense of recent fabrication, to use Supreme Court's unfortunate description of its own ruling in this case. But here, there was more than just "anticipation"—there was certainty. As the majority seems to acknowledge (majority op at 514), a recent fabrication defense was Rosario's only real alternative to a guilty plea. The victim testified that Rosario abused her. If she was not lying, how could there be any reasonable doubt of his guilt?

Before the trial court's ruling admitting the victim's prior consistent statement, Rosario's counsel had made clear enough, though only by implication, that she would pursue the obvious and only line of defense. During voir dire, counsel suggested to prospective jurors "that sometimes a minor . . . might be motivated to make something up if she backs herself in a compromising position"; and "that . . . there are issues between parents and children to the extent that a child might act out and make a false report of something." During her opening statement, defense counsel narrated in meticulous detail the events of the day the victim first complained to the police. Counsel told the jury that the victim wanted to go to the movies with her boyfriend; that her father didn't approve of her going out with a boy; that she was "angry" and "whining about it";

that she then left the house and did not come back; and that she was not found until late in the evening. "So the story begins," defense counsel said. She did not tell the rest of the story—she did not explicitly link the father-daughter argument to the accusation to the police that was made the same day— but she did not need to. Could there be a juror so dull-witted as to miss the point?

Now that Rosario's conviction has been reversed, there must be a new trial. One of two things, it seems to me, must happen. Perhaps Rosario's defense counsel will argue recent fabrication plainly enough to open the door to the prior consistent statement; in that event, the second trial will in substance be a duplicate of the first, with a different jury considering the same issue on the same evidence. Or perhaps defense counsel will tiptoe through the whole second trial as successfully as she did through her opening statement at the first trial, never quite saying "the victim made all this up because she was mad at her father," but leaving the jury to draw the inference. If that is the case, the jury may acquit Rosario because it believes the victim fabricated her story in anger—though the simple, incontrovertible fact is that she did not.

No good purpose is served by reversing Rosario's conviction. It should be reinstated.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, PIGOTT and JONES concur with Judge READ; Judge SMITH dissents and votes to reverse in a separate opinion.

In *People v Rosario*: Order affirmed.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, PIGOTT and JONES concur with Judge READ; Judge SMITH concurs in result in a separate opinion.

In *People v Parada*: Order affirmed.