================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 166
The People &c.,
          Respondent,
        v.
Daniel A. Ludwig,
          Appellant.


          Brian Shiffrin, for appellant.
          Matthew Dunham, for respondent.


READ, J.:

          In this child sexual abuse case, County Court permitted

the People to elicit testimony about complainant's prior

consistent statements disclosing the abuse, and precluded

defendant's mother from testifying about a prior allegedly

inconsistent statement made by complainant.  We conclude that the

trial judge did not abuse his discretion when he made these

evidentiary rulings.  The challenged testimony was admissible for

the nonhearsay purpose of explaining to the jury how and when the

sexual abuse came to light, resulting in an investigation and

defendant's eventual arrest; and defendant's mother's proffered

- 1 -

testimony was inadmissible hearsay not subject to any exception.

I.

Complainant, who was born in 1998, resided with her father, defendant Daniel A. Ludwig, and her mother until April 25, 2008, when defendant moved out of the marital home and into the basement of his mother's house. Complainant, who was in third grade when her parents separated, lived with her mother, but she and her younger brother and sister visited their father on weekends. Defendant and complainant's younger brother slept in the basement, while complainant and her younger sister slept upstairs. The basement was roughly divided into a laundry and bathroom on one side, and two beds (one for defendant, the other for complainant's younger brother), two televisions and a computer on the other side.

According to complainant, defendant sexually abused her when she was in third and fourth grades. The abuse always took place in defendant's basement living quarters. The first time, she had been playing upstairs with her younger sister when defendant called her down to the basement. Defendant was only wearing underwear, and complainant, seeing this, "got scared" and "tried to get back upstairs." But defendant called her back, and she returned "to see what he wanted." Defendant stood up, pulled down his underwear and told complainant to kneel, "grabbed [her] hair" and directed her to suck his penis, which she did for "at least a minute or two minutes." After such incidents, she "would

usually go upstairs and just try not to think about it and just play" with her siblings.

Complainant recalled another specific occasion when defendant sexually abused her.  She was watching an episode of "The Wizards of Waverly Place," a children's program broadcast on ABC's Disney Channel, in her bedroom; the plot involved a tutor and the color green.  Defendant summoned complainant down to the basement and "did the same thing that the first time it happened."  This incident took place during complainant's school vacation period between fourth and fifth grades, the summer of 2009.  On another occasion soon afterwards, complainant was already in the basement when defendant went into the bathroom and called her to follow him.  When defendant pulled his pants down, complainant objected "Why do I need to do it?" and defendant backed off.  This was the last time he attempted to sexually abuse her.

Complainant kept the sexual abuse a secret because "[she] was scared" and "afraid" that defendant "would do something to [her]" if she confided in anyone.  But during the summer after the abuse ceased, on August 3, 2010, complainant let the secret slip.  That day, she and her half-brother, who is three years older, were playing in the backyard of their mother's home.  Complainant remarked to her half-brother that "the backyard smelled like something weird."  He asked "Like what?" and complainant "kind of said what happened with [her] dad."  Her

half-brother went "inside to the living room" and repeated complainant's disclosure to their half-sister, who informed their mother. Complainant acknowledged that when her mother asked her, she confirmed the sexual abuse; this was the "only time" she ever addressed this topic with her mother.

In October 2010, defendant was indicted on one count of predatory sexual assault against a child (Penal Law § 130.96); specifically, that between April 25, 2008 and June 30, 2009, defendant, being 18 years of age or more, committed the crime of course of sexual conduct against a child in the first degree (Penal Law § 130.75 [1] [b]) in that he engaged in two or more acts of sexual conduct, which included at least one act of sexual intercourse, oral sexual conduct, anal sexual conduct or aggravated sexual contact, with complainant, who was less than 13 years old. At defendant's jury trial in County Court in August 2011, she testified on direct examination as narrated above.

On cross-examination, the defense attorney and complainant engaged in the following colloquy:

> "[DEFENSE ATTORNEY] Do you remember having a conversation with your Aunt [P.] about whether your mother was pregnant?
>
> "[COMPLAINANT] No.
>
> "[DEFENSE ATTORNEY] No? Do you remember telling your Aunt [P.] that your mother wasn't pregnant?
>
> "[COMPLAINANT] No.
>
> "[DEFENSE ATTORNEY] Do you remember telling your Aunt

[P.] that you only tell what your mother tells you to say?

"[COMPLAINANT]  No."

On redirect examination, the prosecutor tried to coax complainant into elaborating on her testimony that the backyard smelled "weird" by asking if she could "remember" or "describe" the smell.  Complainant demurred.  When the prosecutor then asked if the smell "remind[ed]" her of anything, complainant responded that "[t]he smell only reminded me of what happened with my dad."

After complainant's testimony, the People called her half-brother to the witness stand.  He recounted that in August 2010, while playing with complainant in the backyard of their mother's home, she remarked that "it smelled like penis in the backyard," and he "asked her how she knew."  When the prosecutor asked him for complainant's reply, her half-brother said that complainant "hesitated a little."  At this point, before the half-brother could finish his answer, the defense attorney jumped in and objected, and the trial judge excused the jury and the witness from the courtroom.

The defense attorney argued that what complainant may have told her half-brother did not fall within the prompt outcry exception to the hearsay rule because the most recent alleged incident of abuse had taken place 14 months before the backyard conversation.  The prosecutor responded that the testimony went to "the state of mind of the witness [and] how he reacted to [the disclosure], what he did when he did it," not to prove the truth

of the matter.

The trial judge agreed with the People that the half-brother's testimony was not being elicited for its truth, and offered to give a limiting instruction to inform the jury that the testimony was only being introduced "for the fact that upon hearing it he then did something."  The judge added that he thought he had already heard what that something was -- i.e, that the half-brother "reported [complainant's disclosure] to his mother."  The defense attorney protested that

> "the fact that the backyard smelled like penis . . . [t]hat's not what I wanted to be heard on. [Complainant's half-brother] is going on to discuss any further conversation that he had with [complainant] that she was -- you know, she was hesitant.  She was -- God only knows what.  If he wants to describe observations, that's one thing.  But the content of her communication with him is inadmissible hearsay."

The defense attorney asked the trial judge not to instruct the jury as to why the testimony was being offered because there was no reason to "highlight the issue."  The judge replied that his proposed instruction was

> "not about highlighting any issues; it's about giving [the jury] an instruction that the question is permissible, but not for their consideration as to whether, in fact, [the backyard] did smell like it back there, but, rather, the anticipatory question as to after [the complainant] having said that[,] what he did."

After the jury returned to the courtroom, the trial judge issued such an instruction.

Complainant's half-brother then related, over repeated objections, further conversation in the backyard with

complainant, and later with their mother; to wit, that when he asked complainant "how she knew what it smelled like," she told him that "she sucked a penis"; that he badgered her to tell him whom she had done this with, and complainant finally divulged "My dad"; that when he then questioned whether complainant was "kidding" or "joking," she replied that she was not; that he "told [complainant] to tell [their] mom, but she wouldn't"; and that he finally repeated complainant's comments to their mother.

The prosecutor then called complainant's mother. She testified that she was in the kitchen of her home on August 3, 2010 when her son, followed by complainant, appeared and announced that "[complainant] needed to tell [her] something"; and that complainant stood with "her fist in her mouth" and "kept shaking her head . . . no, but with her hand in her mouth," as though she might have "hurt her hand," while her half-brother kept urging her "to tell mom." Eventually, complainant's half-brother revealed that complainant had "said the backyard smelled like penis." Complainant's mother asked her daughter if she had said this, and complainant "shook her head yes."

When the prosecutor questioned complainant's mother about what her son told her next, the defense attorney again objected. The trial judge overruled the objection and complainant's mother answered that her son said that complainant "had given [defendant] a blow job." Over another objection, she testified that complainant responded affirmatively when she asked

if this was true.  Complainant's mother "asked her at least one more time if it was all true.  And [complainant] said 'Yes.'" According to complainant's mother, she never again mentioned the matter to her daughter.

After this revelation, complainant's mother telephoned one of defendant's sisters, whom she "look[ed] up to . . . in some way," and a friend, and communicated what she had just learned.  She did not report complainant's allegation to the authorities, but her friend did.  At about 2:00 a.m. the next morning, defendant called her, explaining that "he couldn't sleep."  He denied sexually abusing complainant, and suggested that she "was just misconstruing the fact that she had caught him [masturbating] a few other times."

The People also called Elizabeth Opp, employed by Monroe County as a child protective services caseworker, and Nicole Thomson, a sex abuse crisis intervention specialist at the Catholic Family Center in Rochester.  They both testified about their interviews of complainant in August 2010, soon after the sexual abuse allegations surfaced.  Opp and Thomson were not asked to repeat statements that complainant made to them during these interviews; rather, they described her demeanor when they brought up the allegations of oral sex.

According to Opp, when her conversation with complainant turned to this topic, complainant tilted her head down and became "very closed off, turning away . . . didn't want

to talk, didn't want to engage anymore."  Thomson characterized complainant as "very hesitant" when the subject of the sexual abuse was broached, meaning "[s]he would lower her head.  She would avoid eye contact.  She would push back in her chair.  She would try to . . . make more space between herself and me."  Thomson further testified that complainant exhibited symptoms consistent with post traumatic stress disorder.

Thomson also met with defendant at his request.  She "asked him if he could think of any reason why [complainant] would have made this up or any reason why [she] would have said these things that he said weren't true."  Defendant again attributed complainant's allegation to a misunderstanding, telling Thomson that "he sometimes masturbated in the shower when the kids were at the house and that if he had been masturbating in the bathroom and [complainant] came into the bathroom that he may not have stopped when she asked a question."

Dr. Danielle Thomas-Taylor, a pediatrician with specialized training in evaluating children suspected of being abused, explained that an examination of complainant yielded no physical signs of sexual abuse, and why this was not unexpected given the nature of the allegations and the lapse of time.  Stefen Perkowski, a social worker with expertise in child sexual abuse, gave expert testimony about child sexual abuse accommodation syndrome (CSAAS).  According to Perkowski, CSAAS is generally accepted as valid within the community of child sexual

abuse therapists, and accounts for why children delay reporting and try to block out details of the abuse.  And finally, District Attorney Investigator Robert Siersma testified that he had watched an episode of the "Wizards of Waverly Place" titled "Tutor, My Tutor" where characters donned green costumes; the People introduced into evidence a business record from ABC to show that this particular episode had aired in the summer of 2009.

Defendant's only witness was his mother.  She testified generally about the frequency of complainant's and her siblings' weekend visits with defendant, and the activities that the family engaged in.  Defendant's mother also testified that complainant was a "[v]ery normal, typical grandchild," who "did tell lies about some activities that she would be involved in," such as whether she had completed assigned chores or homework.  At one point, the defense attorney made an offer of proof that defendant's mother had overheard complainant tell one of her aunts on Father's Day weekend in 2011, two months before the trial, that "she only tells what her mother tells she can say." The defense attorney took the position that since complainant on cross-examination had denied having this conversation, defendant was allowed to "impeach [complainant's] credibility" with the testimony of his mother, who was "physically present and heard this child say these words."  The prosecutor objected on hearsay grounds, and the trial judge ruled that the testimony was

inadmissible hearsay.

The jury convicted defendant as charged, and the trial judge subsequently sentenced him to an indeterminate term of imprisonment of from 16 years to life.  On his subsequent appeal, defendant contended that he was denied a fair trial by the prosecutor's references during opening argument to complainant's prior consistent statements, and the testimony of five witnesses (complainant, her half-brother, her mother, Opp and Thomson) who improperly bolstered complainant's credibility by repeating the prior consistent statements; and that his mother should have been permitted to testify about the prior inconsistent statement that she claimed to have overheard complainant make.

The Appellate Division unanimously affirmed in a decision issued in March 2013 (104 AD3d 1162 [4th Dept 2013]). The court first noted that defendant's improper bosltering claims were preserved only as to the testimony of complainant's half-brother and mother, and in any event, Opp and Thomson merely described complainant's demeanor when they brought up her allegations of oral sexual abuse.  The Appellate Division then concluded that the objected-to testimony, as well as complainant's testimony, "did not constitute improper bolstering inasmuch as the evidence was not admitted for its truth[, but rather] to explain how the victim eventually disclosed the abuse and how the investigation started" (id. at 1163 [internal citations omitted]).  Further, since the prior-consistent-

statement testimony from the relevant witnesses was proper,
defendant's attorney was not ineffective for failing to object to
it or to the prosecutor's opening statement.

The court also rejected defendant's claim that the
trial judge improperly precluded his mother from testifying about
complainant's purported prior inconsistent statement.  The
Appellate Division observed that defendant failed to preserve any
claim that this ruling denied him his right to present a defense,
or that the testimony was admissible to establish that
complainant had a reason to fabricate her allegations.  And when
the People objected to the testimony on hearsay grounds, the
defense attorney failed to articulate any applicable exception to
the hearsay rule.  Finally, the Appellate Division declined to
review this claim as a matter of discretion in the interest of
justice, and rejected defendant's remaining claims as either
without merit or unpreserved.

On August 16, 2013, a Judge of this Court granted
defendant permission to appeal (21 NY3d 1043 [2013]).  We now
affirm.

II.

Prior Consistent Statements

As we observed in People v Smith (22 NY3d 462, 465
[2013]),

> "[t]he term 'bolstering' is used to describe the
> presentation in evidence of a prior consistent
> statement -- that is, a statement that a testifying
> witness has previously made out of court that is in

substance the same as his or her in-court testimony." While such statements are generally precluded by the hearsay rule absent an applicable exception, prior consistent statements are notably less prejudicial to the opposing party than other forms of hearsay, since by definition the maker of the statement has said the same thing in court as out of it, and so credibility can be tested through cross-examination (id. at 465-466).  As a result, "in many cases, the admission of purely redundant hearsay creates no greater evil than waste of time" (id. at 466).  Still, there exists a risk that a prior consistent statement "may, by simple force of repetition, give to a jury an exaggerated idea of the probative force of a party's case" (id.).

Here, defendant contends that the trial judge countenanced improper bolstering when he permitted complainant's half-brother and mother to testify that complainant revealed to them on August 3, 2010 that she had performed oral sex on defendant.  Of course, if complainant's disclosure was offered for the truth of the matter asserted -- that the abuse actually happened -- her own testimony fell outside any hearsay exception (see People v McDaniel, 81 NY2d 10, 16 [1993]).  Defendant did not object to complainant's testimony, though.  The hearsay that he complains about was, therefore, already admitted.  Defendant's real grievance is that other witnesses repeated the hearsay.  But since defendant claimed that complainant had made up the allegations (by trial, he had abandoned the fantastic notion that

she might have misperceived his behavior), the circumstances of her disclosure were relevant to her credibility.

In the challenged testimony, complainant's half-brother and mother did not recite any details of the sexual abuse to which complainant later testified in court -- indeed, they could not have done so because she supplied them with no information beyond a bare allegation.  They did, however, describe complainant's appearance: according to her half-brother, complainant "hesitated" and, after telling him that she had performed oral sex, was reluctant to speak further; according to complainant's mother, when pushed by her half-brother to "tell mom what you just told me," complainant stood mute with her fist in her mouth, causing her mother to think at first that she had injured her hand.  Finally, the witnesses explained what actions complainant's disclosure prompted them to take: the half-brother pressed complainant to repeat the allegation to their mother, and, when she was unwilling, told their mother himself; complainant's mother immediately shared the allegation with a trusted sister of defendant's and a friend, which led to the investigation resulting in the charge against defendant.

New York courts have routinely recognized that "nonspecific testimony about [a] child-victim's reports of sexual abuse [do] not constitute improper bolstering [because] offered for the relevant, nonhearsay purpose of explaining the investigative process and completing the narrative of events

leading to the defendant's arrest" (People v Rosario, 100 AD3d 660, 661 [2d Dept 2012]; see also People v Gregory, 78 AD3d 1246, 1246 [3d Dept 2010] [a police officer's testimony about the victim's comments did not "improperly bolster[] the victim's version of events [when] admitted not for its truth but for the narrow purpose of explaining an officer's actions and the sequence of events in an investigation, and the testimony is accompanied by an appropriate limiting instruction"]).  Here, the objected-to testimony fulfilled these legitimate nonhearsay purposes.

At trial, defendant argued that complainant was lying because otherwise she would have reported his alleged sexual misconduct right away, and he proposed a host of reasons why complainant (and/or her mother) might wrongfully accuse him of sexual abuse.  As a result, the challenged testimony was necessary -- not to show that defendant made complainant "suck his penis," but to depict for the jury the circumstances attendant to the disclosure that triggered the investigation.  This evidence was relevant to the jury's assessment of complainant's alleged motive to lie.  As already noted, the witnesses did not recite prejudicial details of the alleged abuse; they merely stated that complainant claimed that she had been made to engage in oral sex with defendant.

My concurring colleague expresses puzzlement that we sanction the admission into evidence of complainant's prior

consistent statements here since we did not do so in People v
Rosario (17 NY3d 501 [2011]) and its companion case, People v
Parada, where, in his view, the "facts are substantially
identical, in relevant ways" to those in this case (concurring op
at 1).  But in both cases, prior consistent statements were
improperly introduced into evidence in the People's direct case
as prompt outcry exceptions to the hearsay rule; the statements
at issue were not, and indeed could not have been, offered for
the nonhearsay purpose relied upon by the People here.

            The disputed prior consistent statement in Rosario was
contained in a note that the complainant wrote and gave to her
boyfriend about a year before she disclosed the sexual abuse to
two police officers with whom she had become friendly through her
participation in a police-sponsored program for teenagers.  The
note was thought to be destroyed or lost and was not presented to
the prosecutor until the eve of the boyfriend's testimony at
trial, a year after the complainant reported the abuse to the
police officers and two years after the note was alleged to have
been written.  In short, the People did not, and indeed, could
not, claim that the admission of the note would serve the
"nonhearsay purpose of explaining the investigative process and
completing the narrative of events leading to the defendant's
arrest" (Rosario, 100 AD3d at 661).  The police officers to whom
the complainant confided the sexual abuse testified at trial
about the facts and circumstances of her disclosures to them

without objection.

In <u>Parada</u>, the complainant disclosed the sexual abuse to a young cousin at a time when the abuse was continuing, and to an aunt, about two years after it ended. She swore both to secrecy, which they honored. About a month or so after the complainant's conversation with her aunt, though, she revealed the abuse to her mother, who then contacted the police. We concluded that the disclosure to the cousin qualified as a prompt outcry, and that the disclosure to the aunt did not, but that its admission into evidence was harmless error. At trial, the complainant's mother narrated the facts and circumstances of her daughter's disclosure of the abuse to her, just as complainant's mother did here. The defense attorney twice objected to this testimony, without stating any basis. The objections were overruled, and the defendant did not argue to us that the mother's testimony was improperly admitted hearsay.

### Prior Inconsistent Statement

Defendant's mother was prepared to testify that she overheard complainant state that "she only tells what her mother tells she can say." Complainant allegedly made this comment during a conversation with an aunt (defendant's sister) regarding complainant's mother's potential pregnancy. Given this context, the statement does not suggest that complainant lies in general, or fabricated sexual abuse accusations against defendant in particular. Any claim that the statement (which complainant

denied making) tends to show that she is untruthful or uncommonly biddable seriously distorts its meaning.  And this hearsay evidence was plainly offered for its truth.  The point of the proposed testimony was to convince the jury that complainant's account of sexual abuse at defendant's hands was instigated by his estranged wife.  In short, while defendant claimed to be proffering this testimony for impeachment purposes, any possible impeachment was solely on the collateral issue of what complainant may have said about whether her mother was pregnant. The case would be different if defendant had offered to prove that complainant admitted that she said only what her mother told her to say about defendant's alleged acts of sexual abuse.

Accordingly, the order of the Appellate Division should be affirmed.

People v Daniel Ludwig

No. 166

SMITH, J. (concurring):

I find this a puzzling case, because its facts are substantially identical, in relevant ways, to those in People v Rosario (17 NY3d 501 [2011]) and Rosario's companion case, People v Parada -- but the result here is the exact opposite.  Each of

- 1 -

those previous cases, like this case, was a prosecution for sexual abuse of a child victim.  In each, the victim was the People's main witness.  In each case, the People offered in evidence a prior consistent statement by the victim, in which she had disclosed the abuse to a friend or relative.  In each of those cases, as in this one, the out-of-court statement provided compelling evidence that the child was telling the truth, and had neither invented her story out of spite nor been coached or pressured by anyone to tell it.

In Rosario and Parada, the majority held the children's statements inadmissible, rejecting the People's argument that they were within the "prompt outcry" exception to the hearsay rule.  I dissented in Rosario, and concurred in the result in Parada (where the majority found the error to be harmless) (see 17 NY3d at 515-521).  I acknowledged that the prompt outcry exception, as traditionally understood, did not fit the cases, but I said that the exception should be broadened, arguing that to keep the children's out-of-court statements from the jury was unfair to the People and the victims, and risked a miscarriage of justice.

The only significant difference between this case and the two earlier ones seems to be that the People here do not rely on the prompt outcry exception to the hearsay rule, but assert that no exception is necessary because the out-of-court statement was not hearsay at all -- that it was offered not to prove its

truth, but for a non-hearsay purpose.  The majority accepts this argument, quoting an Appellate Division case (also called, by coincidence, People v Rosario) that says such out-of-court statements serve to explain "the investigative process" and to complete "the narrative of events leading to the defendant's arrest" (majority op at 14-15, quoting 100 AD3d 660, 661 [2012]).  The majority adds that the out-of-court statement was "relevant to the jury's assessment of complainant's alleged motive to lie" (majority op at 15).

I am unable to follow the majority's logic.  Why did "the investigative process" here need explaining?  What narrative was there to complete?  The jury obviously knew that the victim had disclosed the abuse some time before the trial -- what did it care when and how she did so, unless the nature and circumstances of the earlier disclosure persuaded the jury it was truthful?  We have at times countenanced the admission of out-of-court statements by alleged victims made to police officers, on the theory that it was important for the jury to understand that the police had a good reason for their actions (see People v Morris, 21 NY3d 588, 596 [2013]; People v Tosca, 98 NY2d 660 [2002]).  Thus, the out-of-court statements in those cases were held to serve a purpose that did not depend on their truthfulness: whether true or false, they motivated the police to do what they did, and the motive of the police was something the jury might need to know.  But the disclosure here was not made to the

police: it was made to the victim's brother and mother.  The jury had no reason to know their motives -- or, indeed, to know or care what they did in response to the disclosure of abuse.

As for the victim's "alleged motive to lie," how was the jury supposed to use the out-of-court disclosure to assess it without making any judgment about whether the disclosure was truthful or not?  I would see the majority's point if defendant had alleged a motive to lie that arose after the out-of-court statement -- that would make the statement admissible under the recent fabrication exception to the hearsay rule (People v McClean, 69 NY2d 426, 428 [1987]).  But there is no claim of recent fabrication in this case.

Despite what I consider to be flaws in the majority's reasoning, I welcome the rule that this case seems to establish: that, at least in child sex abuse cases, testimony to the victim's out-of-court disclosure of the abuse will be admissible where it is relevant to the victim's credibility.  I think, for the reasons given in my Rosario opinion, that such testimony enhances the likelihood of a trial that is fair to both sides. There is one important caveat, which I think is implicit in the majority opinion: the rule is limited to prior statements of a testifying witness.  Prior consistent statements are, as the majority explains, a relatively benign form of hearsay (majority op at 12-13).  It would be very different -- and, in my view, would conflict unacceptably with the basic premise of the hearsay

rule -- to admit on a similar theory an out-of-court statement by a declarant not subject to cross-examination.

People v Ludwig

No. 166

LIPPMAN, Chief Judge (dissenting):

The majority eviscerates the hearsay rule and allows wholesale circumvention of the prompt outcry rule by countenancing the admission of prior consistent statements that provide a "narrative" or "investigative purpose" even where the investigative purpose is not in issue. As the concurrence makes plain, these statements are obviously introduced to bolster the complainant's credibility and establish the truth of the accusation. Yet I disagree with the concurrence in its proposed expansion of the prompt outcry rule beyond all recognition. Therefore, I dissent and would hold that the trial court's admission of the half-brother's and mother's testimony, during which they repeated the complainant's out-of-court statements, unfairly bolstered the complainant's testimony and constituted reversible error.

The majority would have us believe that these statements are not hearsay because they are part of a "narrative" or set forth an "investigative purpose," and are not introduced for their truth. But the complainant's out-of-court statements repeatedly communicated to the jury by the victim's half-brother

- 1 -

and mother were introduced to describe what abuse occurred.  The
mother's and half-brother's repetition of these statements would
have been useless to the People unless the jury accepted them as
true.  They constitute double hearsay that did not fall within
any exception to the rule.  The complainant had already described
the crime on the stand, and recounted how she reported the abuse,
without any substantial challenge by defense counsel.  Where
there was no basis to rehabilitate the complainant, the only
possible purpose of admitting the half-brother's and mother's
testimony was to reinforce the complainant's statements and make
her appear more reliable.  As we observed in People v McDaniel
(81 NY2d 10, 16 [1993]), improper bolstering is prohibited
because of the concern that untrustworthy testimony may appear
more reliable simply because it has been repeated.

Out-of-court statements offered for the truth of the
matters they assert are hearsay and "may be received in evidence
only if they fall within one of the recognized exceptions to the
hearsay rule, and then only if the proponent demonstrates that
the evidence is reliable" (Nucci v Proper, 95 NY2d 597, 602
[2001]).  The hearsay rule guards against "traditional
testimonial infirmities" such as insincerity, ambiguity, and
faulty memory or perception (id. at 604), some of which are
implicated here.  In Nucci, proffered out-of-court statements
made several days after a medical malpractice incident were
reported by the plaintiff's relative who "may have had a strong

motive to shade her testimony" (id. at 603).  In that case, we emphasized that "some of the statements involved double hearsay," a further ground to question their reliability (id.).

The "investigative" or "narrative" rationale the majority advances today swallows the hearsay rule.  Any statement that explains a narrative tangentially related to a crime could be admitted into evidence pursuant to the majority's reasoning. Without confining the exception to a narrow set of circumstances, such as sexual abuse cases where the investigation is in issue, the majority countenances the wholesale admission of hearsay. Indeed, a narrative is defined as "a story," "an account of a series of events, facts, etc., given in order and with the establishing of connections between them" (Oxford English Dictionary [3d ed 2003]), and "a[n] account of events, experiences, or the like, whether true or fictitious."[1]  Such broad opportunity for the admission of hearsay creates a danger of false and fabricated accusations spread amongst family and friends who would then enhance the complainant's reliability.

Moreover, in the few cases where the investigative purpose rule has been applied, that purpose was in issue and the court provided a proper limiting instruction to the jury prescribing the use of the statement for a narrow purpose and not for its truth.  For example, as the majority points out, in People v Gregory (78 AD3d 1246, 1246 [3d Dept 2011], lv denied 16

---

[1] Webster's Unabridged Dictionary [2d ed 1998]).

NY3d 831 [2011]), a police officer's testimony about the victim's comments explained the officer's actions and the sequence of events in an investigation. Accompanying the testimony was an appropriate limiting instruction prohibiting the jury from accepting the statement for its truth.  Here, the danger of the hearsay was missed entirely and the limiting instruction was plainly inadequate; the jury was only told that the statements were not to be used as proof that the backyard smelled, and there was no instruction barring the jury's use of the remaining statements to prove that the abuse actually occurred.

Extending the "prompt outcry" rule to these circumstances, as suggested by the concurrence, is just another recipe for the admission of false and fabricated accusations. Any disclosure made by the victim about a crime before the crime was reported to authorities would, under this formulation, be admissible.  Currently, the prompt outcry rule "permits evidence that a timely complaint was made" (People v Rosario, 17 NY3d 501, 511 [2011] [internal quotation marks and citation omitted]).  The reporting must occur shortly after the crime (see People v McDaniel, 81 NY2d at 17 [victim reported the abuse the morning after it occurred]; Rosario, 17 NY3d at 513 [victim's statement inadmissible where, as long as five months elapsed between the abuse and the report]).  Further, only the fact of a complaint, not its accompanying details, may be elicited (see McDaniel, 81 NY2d at 17; People v Rice, 75 NY2d 929, 932 [1990]).  We have

never before held that the prompt outcry rule applies to reports this far removed from the crime -- over a year after the abuse -- and containing such graphic description of the crime.

The erroneous admission of the half-brother's and mother's statements here severely prejudiced defendant because, apart from the complainant, there were no witnesses to the crime. Without other corroborating evidence, the repeated communication of the complainant's out-of-court statements constitutes reversible error (see McDaniel, 81 NY2d at 20).

For the reasons stated above, I dissent and would reverse and remand for a new trial.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed.  Opinion by Judge Read.  Judges Graffeo, Pigott and Abdus-Salaam concur.  Judge Smith concurs in result in an opinion.  Chief Judge Lippman dissents in an opinion in which Judge Rivera concurs.

Decided October 23, 2014