The People of the State of New York, Respondent,
Donald Olsen, Appellant.
Matthew W. Brissenden, for appellant.
Suffolk County District Attorney (Lauren Tan of counsel), for respondent.

Appeal from three judgments of the District Court of Suffolk County, First District (Carl J. Copertino, J.), rendered July 14, 2016. The judgments convicted defendant, upon jury verdicts, of two charges of sexual misconduct and one charge of sexual abuse in the third degree, respectively.




ORDERED that the judgments of conviction are affirmed.
Following a jury trial, defendant was convicted of two charges of sexual misconduct (Penal Law § 130.20 [2]) and one charge of sexual abuse in the third degree (Penal Law § 130.55), respectively.
Defendant's convictions stem from allegations that he sexually abused his step-nephew once in 2003 and once in 2004, when defendant was in his 30s and his step-nephew was 15 years old. The step-nephew first reported these two incidents to his mother and stepfather in 2007.
At the outset of the trial in 2016, defendant's counsel sought to preclude "any details of the facts of the outcry" from the parents of the victim, because there had been no prompt outcry. The People argued that this was "a delayed disclosure case," that "the manner in which the disclosure occurred is directly relevant to [the] material issue" in this case, and that the testimony of the victim's parents was being offered to show "the state of mind of the victim . . . regarding the material issue of delayed disclosure." The testimony was not being offered for its truth, but rather to show what "led to a call to the police." The court permitted the testimony regarding delayed disclosure.
The victim's stepfather testified about his family's dynamics, alleging that he would yell frequently when attempting to discipline his stepsons, including the victim. His brother, defendant, was verbally aggressive with his step-nephews, including the victim. In 2003, defendant had been hospitalized in Ohio, following which defendant moved back to Suffolk County and lived in the basement of his parents' house. In August or September of 2007, and after the victim had graduated from high school, he began drinking alcohol and smoking marihuana. The family sent the victim to Vermont to stay with his great uncle. After about one month in Vermont, the victim was arrested and charged with stealing a motor vehicle. The [*2]victim's stepfather subsequently brought the victim home to Suffolk County. Several days after they arrived home, the victim told his stepfather that he had been molested by defendant. The victim had a "[t]otal breakdown." He was "crying, just balling," and repeatedly told his stepfather that he was sorry. The victim's stepfather replied that he had nothing to be sorry for. The stepfather went to his parents' house, and confronted defendant. He has had no contact with defendant since then.
At the conclusion of the direct examination of the stepfather, the court provided the jury with a limiting instruction, that "[t]he testimony you've just heard was not elicited for the truth of what [the victim] told the witness, that is whether or not what [he] told the witness actually happened, it was elicited for the fact upon hearing it, the witness then did something as a result of hearing it and to explain the delayed disclosure."
Counsel objected to the proposed testimony of the victim's mother, and the detective who was assigned to the case, arguing that the testimony would be cumulative and constitute bolstering. The court permitted the testimony.
The victim's mother testified that the victim was born on September 10, 1988. In late September 2007, after the victim had been arrested and returned home from Vermont, the mother went fishing with him, because "he hadn't been himself at all." The mother wanted to "talk to him and find out what was going on with him." While in the car, the victim suffered a nosebleed, started to throw up, and then "yelled out that his Uncle Donald had been molesting him." The mother subsequently called the police. After direct examination ended, the court provided the jury with a similar limiting instruction with respect to the mother's testimony.
Counsel moved for a mistrial, arguing that the People had "elicited from this witness the exact words of what" the victim allegedly said in his outcry. The court denied the motion, stating that the testimony was just general and not detailed.
Retired Suffolk County Police Detective Margaret Kirk of the Special Victims Unit interviewed the victim on September 24, 2007. The victim provided a time frame and an approximation of when the events occurred. No one corroborated his allegations. Defendant was arrested in October 2007.
The victim, who was 27 years old at the time of the trial, testified that, while he was in high school, he had been suspended 10 to 12 times for fighting and using marihuana. The victim began using cocaine when he was 17. Before 2003, the victim saw defendant about once a year. Defendant would try to discipline him, which would usually result in an argument with the victim's stepfather. The victim was alone with defendant several times. The first time was between Thanksgiving and Christmas of 2003. He was 15 years old, and was in the basement of his step-grandparents' house. The victim and one of his brothers were there for two nights. His step-grandparents slept upstairs. His brother slept in the living room. There was a "blowup" mattress next to defendant's bed. There was a computer desk with a computer in the basement. On the night in question, defendant sat in the computer chair. The victim noticed that defendant was watching pornography. Defendant asked the victim to watch it with him. 
The victim further testified that defendant had placed his hand on the victim's right shoulder and touched the victim's penis over his pants. Defendant then had the victim sit in a chair next to the computer chair. They watched pornographic videos. Defendant again touched the victim's penis with defendant's left hand, over the victim's pants. Defendant then reached into [*3]the victim's pants and touched his penis. Defendant unbuttoned and pulled down the victim's pants. Defendant grabbed the victim's right hand and put it on defendant's penis. Defendant then grabbed the victim's penis with his left hand and masturbated him. Defendant had an erection, and the victim also had an erection. The prosecutor asked the victim to describe defendant's erect penis. The victim testified as to its length and width, and the fact that defendant had been circumcised.
The victim further testified that defendant then put his left hand on the victim's back and guided him to defendant's bed. He asked the victim to lay down on the bed. Defendant straddled the victim and placed his penis in the victim's anus, moving it in and out. Defendant asked the victim if he liked it. The victim did not respond. He did not resist, scream, or tell defendant to stop. The victim did not want his stepfather to find out what had happened. The anal penetration lasted about 15 minutes. The victim did not see a condom. Defendant did not ejaculate. The victim did not bleed. The victim slept on the "blowup" mattress in the basement next to defendant's bed. The next morning, the victim had breakfast with his step-grandparents and brother. He did not tell them what had happened because of his stepfather. The next night, the victim pretended to fall asleep early so he could sleep in the living room.
The victim further testified that he was again alone with defendant around the Fourth of July of 2004. The victim was still 15 years old. His stepfather asked him to go to his step-grandparents' house to help paint the basement. Defendant again went to the computer and watched pornographic videos. Defendant asked him to watch pornography with him. Defendant asked the victim if he liked the pornography. The victim replied that he did not. The victim testified in great detail how defendant then engaged in sexual activity with him, similar to the activity that occurred in 2003, but "more rough." The victim then went home, locked himself in his room and spent most of the day crying. His parents were at work.
The victim also testified that, in June or early July of 2007, defendant came to the victim's house to drive him to a party. The victim was in the bathroom, taking a shower. The victim grabbed a pair of scissors because he "figured [defendant] might try to do something." Defendant asked the victim if the scissors were for him, meaning if the victim was going to stab him. The victim replied, "yes."
The victim admitted that, on September 20, 2007, he was arrested in Vermont for stealing a truck. He was charged with three felonies and three misdemeanors. In 2008, he pleaded guilty to a misdemeanor charge of operating a motor vehicle without the knowledge and consent of the owner. He was sentenced to a term of 6 to 12 months of probation and performed community service in New York. 
The victim testified with respect to the fishing trip with his mother on September 23, 2007. She was upset with him and told him "that there has been nothing wrong in [his] life for [him] to act the way [he] had acted and to do the things [he had] done." The victim testified that it was "hard to keep something like that inside and to have someone sit there and tell you there is nothing wrong with your life when there is something bad." He told his mother that defendant had molested him. The victim told his mother multiple times not to tell his stepfather. However, when they arrived home, the victim told his stepfather. He apologized to his stepfather multiple times. He thought he had done something wrong and had hurt his stepfather. Later that day, the police came to his house and, that night, he went to the police station and spoke to Detective [*4]Kirk.
During cross-examination, the victim admitted that he had told an assistant district attorney that he "had a hard time remembering facts about what happened." However, the assistant district attorney had the notes Detective Kirk had taken while she had interviewed the victim in 2007. Numerous details of the two incidents did not appear in his statement to Detective Kirk. The victim admitted that he was arrested on June 13, 2009, on a charge of criminal possession of a controlled substance on a constructive possession theory. He did not notify his probation officer about that arrest.
During redirect examination, the victim testified that he had told Detective Kirk that the first incident had occurred between Thanksgiving and Christmas 2003, and the second incident had occurred around the Fourth of July of 2004. He was "not fuzzy" about any of the facts he had testified to in court.
Dr. Anne Meltzer, a child psychologist specializing in child sexual abuse, was qualified by the court as an expert in the areas of child sexual abuse and child psychology. She was "told some basic facts of the case" and defendant's name. She did not know the name of the alleged victim. She had never interviewed or met the victim, or read any documents or reports in connection with this case. She needed to know some basic facts about the case before testifying "to see if [she] had knowledge that would be helpful to the jury regarding issues in the case." Her role was "to impart my knowledge about some of the common behaviors and reactions that children have who have been sexually abused."
Dr. Meltzer testified that, in general, children and adolescents are sexually abused "by someone who they know, someone they might view as an authority figure." Children and adolescents "typically will go along with the abuse and . . . will also delay disclosing the abuse." Children and adolescents delay disclosure because "the child usually knows who the abuser is. Children sometimes think it is their fault that they are being abused, that they will not be believed, or that they will be punished or people will be upset with them if they disclose the abuse." Boys are less likely to come forward than girls, and it is even less likely if the perpetrator and the victim are both male. Adolescents need to see themselves as normal and not to have other people see them as a victim of sexual abuse. Their guilt and embarrassment increases if they feel that they had participated in some way.
The prosecutor asked Dr. Meltzer a hypothetical question about an adolescent male victim who had an erection at the time of the abuse. The witness testified that it would make the victim feel as if he was "stimulated by this," and to "kind of question [his] own masculinity." It "increases feelings of shame and guilt for adolescent males." The prosecutor asked Dr. Meltzer what might prompt disclosure of the abuse. She replied that there are two categories of disclosure, one of which was "accidental disclosure," when a child is "in some emotional charged stage or fit of anger or rage [and] will blurt out they have been abused." Someone may ask "what is going on and at that point they might disclose what's happened."
Dr. Meltzer testified that where there is a close relationship between the abuser and the victim's parents, there would probably be delayed disclosure. Moreover, in a "family setting where a child has been punished or there has been domestic violence that a child may have viewed," disclosure of sexual abuse may be delayed "because it increases the child's fear there is going to be some . . . negative repercussions from . . . making a disclosure." Delayed disclosure [*5]"is really one of the most common features of child sexual abuse cases." Over time, it may be hard for a child to remember "peripheral or more minor details," as opposed to the "main facts or details of what happened."
After the completion of Dr. Meltzer's direct examination, defendant's counsel moved to strike the testimony on the ground that it gave "validation to the allegations" of abuse. Dr. Meltzer had indicated that she believed her testimony can help, which was exactly what the jury was not to infer. The prosecutor argued that when Dr. Meltzer "testified that she could help . . . it was a general statement that she was an expert in the type of case that was before the Court." Dr. Meltzer was testifying to issues beyond the ken of the jury. Counsel then argued that Dr. Meltzer's testimony became fact-specific, as it covered "delayed disclosure, adolescence, a male victim, erection at the time of abuse, how that would affect an individual, implicit perception of a threat, family member abuse, passage of time on memory, [and] how the child would feel if they participated." The court denied defendant's motion.
Defendant's father, Donald Olsen, Sr., testified on defendant's behalf that defendant had been hospitalized in Ohio on November 15, 2003, and was discharged on November 24, 2003. Olsen subsequently testified that defendant "came home from the hospital" in July of 2004, was released to his care, and lived in the basement in his house. There was only one bed in the basement. There was no "blowup mattress." During the summer of 2004, the witness, the victim, the victim's brother, and defendant painted the basement. Defendant helped paint for only two hours, because he had asthma and was affected by the fumes. Defendant was never alone with the victim on the day the basement was painted. Defendant could not sleep in the basement due to the fumes from the paint.
During cross-examination, Olsen testified that he did not remember if any of his grandchildren were in his house between Thanksgiving and Christmas of 2003. Defendant lived in Ohio in 2003. He returned to New York in 2004 and lived in Olsen's basement. Defendant would be on his computer until 3:00 a.m., but he did not watch pornography. The prosecutor showed Olsen eight pages of e-mails, which had been marked for identification, containing the e-mail address of defendant's business. When the prosecutor asked Olsen if he knew what the documents were, defendant's counsel objected, as the documents were not in evidence. The court permitted the question regarding the documents. Olsen replied, "[y]es." The prosecutor then asked Olsen whether it was his "testimony still that your son doesn't watch pornography." Olsen replied, "I don't know what he watch[es] . . . I'm not at his house."
After Olsen testified, the prosecutor asserted that the e-mails shown to Olsen, which were not in evidence, were provided by defendant's ex-wife, and were "used to cross-examine the witness." The prosecutor argued that "[t]here is no barring what I can use to cross-examine a witness as far as refreshing recollection or impeaching his credibility as to whether or not he actually knew if his son was watching pornography." Defense counsel stated that he had never received the documents before they were shown to Olsen, charging that it was "a blatant sandbagging and I sat here not knowing what he was looking at." The prosecutor argued that the e-mails were "from a pornography website which is clearly not discoverable in this case." Counsel responded that it was "being offered as saying my client watched porn." The court stated that the e-mails had not been admitted in evidence, and that while they were not used to refresh Olsen's recollection, their use was not objected to. Moreover, they were not discoverable.
Counsel argued during summation that the victim did not fight defendant off, or tell him to get off him, or call for his brother or grandparents. The victim did not tell anyone that he was molested by defendant until after he was arrested in Vermont in 2007. It did not make sense that he did not disclose the abuse until then to preserve the family. Counsel suggested that it was all about the arrest.
The prosecutor, during summation, made the following argument:
"Dr. Meltzer explained what she called accidental disclosure. She told you often with a buildup of emotion, a sexual assault victim will have that emotion overcome their fears and they will disclose just like [the victim] did. . . . Again, Dr. Meltzer's testimony, she discussed the feelings of guilt and blame that victims have. Guilt they should have done more to protect themselves. Guilt that their parents would be disappointed in them. Guilt . . . for being the victim."
No objection was raised by the defense to these comments. The prosecutor subsequently stated the following:
"If [the victim] is fabricating this abuse, he is making it up, he is lying as defense counsel says, how can he possibly know [the length, width and details of defendant's penis?] [The victim's] testimony on that was uncontroverted. How can he possibly know that?"
No objection was raised by defendant's counsel to these comments at the time. However, after the prosecutor completed the summation, counsel argued that this comment constituted burden-shifting, and moved for a mistrial. The court denied the motion.
The jury found defendant guilty of sexual misconduct with respect to the 2003 incident and guilty of sexual misconduct and one charge of sexual abuse in the third degree with respect to the 2004 incident. On July 14, 2016, the court sentenced defendant to consecutive terms of incarceration of one year on each conviction of sexual misconduct, and a term of 90 days of incarceration on the conviction of sexual abuse in the third degree, to run concurrently "to any other sentence that [he is] serving."
On appeal, defendant argues that the verdict of guilt was against the weight of the evidence; that the court improperly permitted bolstering testimony by the victim's parents regarding his behavior when he disclosed the alleged abuse in 2007; that the court improperly permitted testimony by Dr. Meltzer that was tailored to the facts of the case and, thus, also constituted bolstering; that the prosecution improperly confronted defendant's father with e-mails that had not previously been disclosed to the defense that served to discredit his testimony that defendant never watched pornography; and that the prosecutor, during summation, improperly argued that Dr. Meltzer's testimony corroborated the victim's allegations, and engaged in burden-shifting when arguing that the victim's testimony regarding defendant's penis was uncontroverted.
The People respond that most of defendant's contentions are unpreserved and all lack merit.
In conducting an independent review of the weight of the evidence (see People v Danielson, 9 NY3d 342, 348 [2007]), great deference is accorded to the jury's opportunity to view the witnesses, hear their testimony, and observe their demeanor (see People v Mateo, 2 NY3d 383 [2004]; People v Bleakley, 69 NY2d 490, 495 [1987]). Upon a review of the record, we find that the verdict of guilt was not against the weight of the evidence (see People v Romero, [*6]7 NY3d 633 [2006]). The victim's testimony as to the two incidents of alleged sexual abuse was extremely detailed, including, for example, the layout of and items in the basement, which hands were used, the clothing that both the victim and defendant wore, the nature of the acts, and the amount of time they lasted (see People v Medlin, 144 AD3d 426, 426 [2016] [the "jury could have reasonably concluded that the victim's detailed description of sexual activity had the ring of truth and could have only been the product of actual experience, and that she had no reason to accuse defendant, her mother's boyfriend, unless he was the perpetrator"]).
"A witness' trial testimony ordinarily may not be bolstered with pretrial statements. Several rationales underlie the rule: untrustworthy testimony does not become less so merely by repetition [and] testimony under oath is preferable to extrajudicial statements" (People v McDaniel, 81 NY2d 10, 16 [1993] [internal citations omitted]). However, in People v Ludwig (24 NY3d 221, 230-231 [2014]), the Court of Appeals determined that, while bolstering testimony was not admissible absent an exception to the hearsay rule, prior consistent statements encompassing nonspecific testimony about a child victim's reports of sexual abuse are admissible and are not considered bolstering when they are not admitted for their truth but to explain the investigative process and complete the narrative of events leading to a defendant's arrest. The court noted that, while "there exists a risk that a prior consistent statement 'may, by simple force of repetition, give to a jury an exaggerated idea of the probative force of a party's case,' " such prior consistent statements "are notably less prejudicial to the opposing party than other forms of hearsay, since by definition the maker of the statement has said the same thing in court as out of it, and so credibility can be tested through cross-examination. . . . As a result, 'in many cases, the admission of purely redundant hearsay creates no greater evil than waste of time' " (People v Ludwig, 24 NY3d at 230, quoting People v Smith, 22 NY3d 462, 465-466 [2013]). In Ludwig, the victim's mother and half brother did not testify to the details of the sexual abuse beyond a bare allegation, but described the victim's behavior upon disclosure, and what actions the complainant's disclosure prompted them to take (see People v Ludwig, 24 NY3d at 231).
Here, similarly, the victim's parents provided no testimony regarding the details of the abuse, beyond the bare allegation that the victim told them that defendant had molested him. All they testified to was the circumstances of the disclosure, that the victim cried, and repeatedly told his stepfather that he was sorry. He suffered a nosebleed and vomited in the car when he told his mother. His stepfather went to defendant's home and confronted him, and the police were called. Thus, under Ludwig, the testimony was admissible. Moreover, the court explicitly told the jury that the testimony was not being admitted for its truth.
Expert testimony regarding sexual abuse "may be admitted to explain behavior of a victim that might appear unusual or that jurors may not be expected to understand" (People v Carroll, 95 NY2d 375, 387 [2000]). It is admissible where, as in the case at bar, it explains "why a child may wait a long time before reporting the alleged abuse," where it is general in nature and the expert does not meet the victim and explains that the testimony is "not to be construed as giving an opinion as to whether the victim was indeed a victim of abuse" (People v Williams, 20 NY3d 579, 584 [2013]; see People v Spicola, 16 NY3d 441, 466-467 [2011]; People v Drake, 138 AD3d 1396, 1398 [2016]; People v Gopaul, 112 AD3d 966, 966 [2013] [expert testimony is admissible "to explain the issue of delayed disclosure"]). However, such testimony will not be admissible where the prosecutor tailors "the hypothetical questions to include facts concerning [*7]the abuse that occurred" in the particular case, which goes "beyond the ken of a jury, and ha[s] the prejudicial effect of implying that the expert found the testimony of this particular complainant to be credible" (People v Williams, 20 NY3d at 584; see People v Rodriguez, 115 AD3d 580, 581 [2014]).
The testimony of Dr. Meltzer started out as a general discussion of sexual abuse of children and adolescents, and why disclosure might be delayed. However, the prosecutor also asked Dr. Meltzer a hypothetical question about an adolescent male victim who had an erection at the time of the abuse. In addition, the prosecutor elicited testimony regarding "accidental disclosure" in which the victim who is "in some emotional charged state or fit of anger or rage will blurt out they have been abused" after being asked "what is going on" with respect to their recent behavior. The prosecutor further asked about a victim who had a close relationship with his or her parents.
To the extent the testimony of Dr. Meltzer was improperly admitted, because the prosecutor's questions included facts concerning the alleged sexual abuse, the error was harmless. The Court of Appeals so held in the Williams case (20 NY3d at 585), as follows:
"This error, however, was harmless because the evidence of defendant's guilt was overwhelming and there was no significant probability that, but for the introduction of the erroneous portion of [the expert's] testimony, defendant would have been acquitted. Here, both victims testified in detail as to the sexual acts committed by defendant."
Defendant correctly argues that the recollection of Donald Olsen, Sr., was not being refreshed when he was asked by the prosecutor during cross-examination to look at eight e-mails and respond as to whether it was "still" his testimony that his "son doesn't watch pornography." The e-mails were never admitted in evidence, and their contents were never testified to. All the jury knew was that Donald Olsen, Sr., was shown several pieces of paper and was asked whether or not he still believed his son did not view pornography. Olsen replied, "I don't know what he watch[es]." This testimony did not corroborate that defendant watched pornography. Thus, reversal is not required on that ground.
The comment by the prosecutor during summation—that a portion of Dr. Meltzer's testimony regarding disclosure of sexual abuse after a buildup of emotion, "just like [the victim] did"—was never objected to by defendant. Thus, the issue is unpreserved for appellate review. Moreover, although some of Dr. Meltzer's testimony may have been inadmissible, this was the only comment made by the prosecutor during summation that attempted to explicitly tie the victim's actions to Dr. Meltzer's testimony. While the prosecutor's comment during summation that the victim's testimony regarding defendant's penis "was uncontroverted" constitutes burden-shifting, and the defense moved for a mistrial, the assertion was stated only once and was thus isolated. Assuming that the issue is preserved for appellate review despite defense counsel not requesting a curative instruction, there was no pattern of burden-shifting comments by the prosecutor. Thus, reversal based on that comment is not required (see People v Jordan, 34 AD3d 927, 930 [2006]).
Accordingly, the judgments of conviction are affirmed.
GARGUILO, J.P., MARANO and RUDERMAN, JJ., concur.
ENTER:
Paul Kenny
Chief Clerk
Decision Date: April 12, 2018